**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 26-cv-21836-BLOOM**

FRAYDA LINDEMANN and SLOAN
LINDEMANN BARNETT,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant United States of America's

("Defendant" or "United States") Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF

No. [6] ("Motion"). Plaintiffs Fraya Lindemann and Sloan Linemann Barnett ("Plaintiffs") filed a

Response in Opposition, ECF No. [17], to which Defendant filed a Reply, ECF No. [19]. Plaintiffs

also sought and received leave to file a Surreply, ECF No. [22]. The Court has reviewed the

Motion, the supporting and opposing submissions, the record, the applicable law, and is otherwise

fully advised. For the reasons that follow, Defendant's Motion is granted.

### I.      BACKGROUND

In this defamation action, Plaintiffs allege in the Complaint that, over 30 years ago, the

patriarch of the Linemann family, George Lindemann Sr., acquired Cambodian sculptures from

well-known and reputable art dealers. ECF No. [1-1] ¶ 2. In 2023, after the U.S. Department of

Homeland Security ("DHS") and U.S. Attorney's Office for the Southern District of New York

("USAO") concluded an investigation of a different art dealer in connection with alleged

smuggling of Cambodian sculptures, the U.S. Government told the Lindemanns that the

Cambodian government was claiming that certain sculptures had been wrongfully taken from Columbia. *Id*.

In response to Cambodia's claim, the Lindemanns voluntarily returned the sculptures, even though they had no knowledge of or involvement in any wrongdoing in connection with the sculptures Mr. Lindemann had lawfully acquired. *Id.* ¶ 3. The Lindemanns did not seek or receive any compensation in exchange for the sculptures, nor did they seek or want any publicity for doing so. *Id*.

John Paul Labbat, a DHS agent who had been involved with the Government's investigation, instructed the Lindemanns when and where to deliver the sculptures for their return to Cambodia. *Id.* ¶ 4. Labbat identified a warehouse in upstate New York. *Id.* ¶ 19. After the sculptures were delivered to the warehouse Labbat had designated, Anderson Cooper and a television crew from CBS' 60 Minutes program arrived at the warehouse. *Id*.[1]

In December 2023, the corresponding 60 Minutes episode aired, heavily featuring Labbat, whom Cooper interviewed. *Id.* ¶ 5. In the interview, which is still available on demand, Labbat stated that the Lindemann family returned the sculptures because they knew that the sculptures "were dirty" and "had been looted." *Id*. This statement was false. *Id*. For one, the Government expressly found that the Lindemanns had not committed any wrongdoing and actually praised them for voluntarily returning the sculptures. *Id*. Moreover, the Lindemanns did not know and were never presented any evidence that the sculptures had been "dirty" or "looted." *Id*.

---

[1] In a supplemental submission filed at the Court's direction, the Government indicates that Labbat retired on September 30, 2023. ECF No. [24] ¶ 2. The Government explains that Labbat spoke to 60 Minutes on two occasions. The first occurred on September 13, 2023. *Id.* ¶ 3. The second interview was coordinated prior to Mr. Labbat's retirement but occurred one day after his retirement, on October 1, 2023. *Id*.

Since then, Labbat has made additional false statements about Plaintiffs. *Id.* ¶ 6. Most recently, he told or implied to the author of a forthcoming book that the Lindemann family had known that the sculptures had been wrongfully taken from Cambodia and that the family had something to do with the wrongful taking. *Id.* These statements were knowingly false and were debunked by the Government. *Id.*[2]

In December 2025, Plaintiffs filed their Complaint in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, asserting a claim of defamation and defamation per se against Labbat.

On March 19, 2026, the United States filed a Notice of Removal and Substitution of Party pursuant to 28 U.S.C. § 2679(d)(2), certifying that Labbat is a federal employee and United States of America is the proper Defendant in place of Labbat. ECF No. [1]. Defendant thereafter filed its Motion, arguing the Complaint should be dismissed for lack of subject matter jurisdiction. ECF No. [6]. Specifically, insofar as the Complaint alleges defamation "by a federal employee who was acting in the course and scope of his employment," the claim can only be brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("FTCA"), and the FTCA does not waive sovereign immunity for intentional torts like defamation. *Id.* at 3–5. Moreover, a federal court upon removal adopts the jurisdiction of the state court that initially heard the case, and the state court did not have jurisdiction to hear an FTCA claim. *Id.* at 3. Finally, Defendant argues Plaintiffs have not exhausted their administrative remedies as required by the FTCA. *Id.* at 4.

---

[2] In the same supplemental submission, the Government indicates that Labbat spoke to author Matthew Campbell on several occasions from November of 2023 through February of 2024. ECF No. [24] ¶ 4. The Government also points out that the interviews with Campbell were initially authorized in August of 2023 DHS and were coordinated through the DHS Director for Office of Public Affairs/Television and Motion Pictures, even after Mr. Labbat's retirement. *Id.* Further, all content discussed with Mr. Campbell was approved by DHS prior to publication. *Id.*

Plaintiffs respond that the United States is not the proper Defendant, as Labbat was not acting within the scope of his duties at the time of the defamatory statements. ECF No. [17] at 7–8. For one, Labbat retired in September 2023, so at least some of the defamatory statements appear to come after his time as a DHS employee. *Id.* at 13–15. Second, even if he was an employee at the time of the alleged defamatory statements, being interviewed by 60 Minutes or talking to an author do not appear to be within the scope of his duties as an ICE agent. *Id.* at 8–10. If the United States is not the proper Defendant and instead a private figure, Labbat, is, then the United States' other bases for dismissal fail. *Id.* at 15–16. Thus, Plaintiffs seek either (i) limited jurisdictional discovery to establish the dates of Labbat's employment, interview with 60 Minutes, and communications with the author, and the history and nature of Labbat's duties or (ii) denial of the Motion. *Id.* at 3.

The United States replies, first, that Labbat's actions were within the scope of his employment as his "conduct arose directly from his official duties." ECF No. [19] at 3. DHS authorized the 60 Minutes interview and the conversation with the author, which the Government's evidence makes clear took place on September 13, 2023 and at some point after August 2023, respectively. *Id*. Second, the United States argues that no discovery is warranted, as Plaintiffs have "identif[ied] no concrete factual discrepancy and offer only speculative ideas as to why the certification might be improper." *Id.* at 7.

In their Surreply, Plaintiffs point out that the United States has conceded that Labbat made some of the defamatory statements when he was no longer a Government employee, specifically by stating that the "majority" of Labbat's statements occurred when he was still employed and by referring to statements made "after" Labbat's retirement. ECF No. [22] at 2–3 (citing ECF No. [19] at 6, 16). Moreover, the new exhibits do not clarify any of the key details, such as the date

Labbat retired, the date(s) he was interviewed by 60 Minutes, and the date(s) he was interviewed by the author. *Id.* at 4.

The Court ordered the United States to provide a supplemental submission identifying (a) the date that Labbat retired, (b) the date(s) on which Labbat spoke with 60 Minutes, and (c) the date(s) on which Labbat spoke with author Matthew S. Campbell regarding the investigation into the Lindemanns. ECF No. [23]. The United States filed a responsive submission. ECF No. [24].

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(1) challenges the district court's subject-matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence*, 919 F.2d at 1529). "'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* (quotation marks omitted); *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("[A] factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.") (citation omitted).

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citing *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 11 (1799) and *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-183 (1936)). Once a federal court determines that it is without subject matter jurisdiction, "the court is powerless to continue." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974-75 (S.D. Fla. 2023); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

"A district court can hear a case only if it has at least one of three types of subject matter jurisdiction: (1) jurisdiction under specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)." *Hensley v. Hartford Cas. Ins. Co.*, 113 F.4th 1327, 1332 (11th Cir. 2024) (quoting *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1317 (11th Cir. 2017) (internal quotations omitted)). With regard to federal question jurisdiction, the district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C § 1331; *see Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002) ("[F]ederal jurisdiction generally exists 'only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'") (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).

### III.   DISCUSSION

The United States' Motion primarily argues that, insofar as Labbat was a federal employee operating within the scope of his employment, the state court lacked jurisdiction to hear the case, and this Court's derivative jurisdiction upon removal therefore precludes it from hearing the case.

ECF No. [6] at 3. Plaintiffs dispute that Labbat was a federal employee and argue that the United States' bases for dismissal do not apply. ECF No. [19]. To address whether dismissal is warranted, the Court first determines whether Labbat was a federal employee acting within the scope of his employment and assesses the jurisdictional issues raised in the Motion.

### A. Whether Labbat was a Federal Employee

The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1305 (11th Cir. 2022) (quoting *Osborn v. Haley*, 549 U.S. 225, 229 (2007). The Westfall Act "empowers the Attorney General to respond to a suit against a federal employee by certifying that an employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'" *Id.* (citing 28 U.S.C. § 2679(d)(1), (2)). Upon the Attorney General's certification, the defendant employee is dismissed, and the United States is substituted in the employee's place. *Id.*

However, a Westfall Act certification does not conclusively establish that the United States' substitution as the defendant for purposes of trial is proper. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). "If a plaintiff challenges the Attorney General's certification, the District Court must apply *de novo* review to the Attorney General's scope of employment certification." *Id.* Still, "because the Attorney General's certification serves as *prima facie* evidence that the conduct at issue occurred within the scope of employment, the 'burden of altering the status quo by proving that the employee acted outside the scope of employment is . . . on the plaintiff.'" *Id.* (omission in original) (quoting *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990), *amended*, 924 F.2d 1555 (11th Cir. 1991)). Neither the Supreme Court nor the Eleventh Circuit has expressly stated the evidentiary standard applicable to this fact-intensive

analysis. However, the Supreme Court has explained that the United States "must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley*, 549 U.S. 225, 231 (2007) (emphasis in original).

Finally, once it is determined that an individual was a federal employee, "[t]he question of whether an employee's conduct was within the scope of his employment is governed by the law of the state where the incident occurred." *Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996) (internal quotation marks and citations omitted). Plaintiffs and the United States agree that New York law governs the scope of employment question here, ECF Nos. [17] at 2 and [19] at 2,[3] and [u]nder New York law, an employee acts within the scope of his employment when [i] 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and [ii] '[the employee] is doing something in furtherance of the duties he owes to his employer.'" *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007)). To determine whether an employee's tortious acts are done in furtherance of the duties he owes to his employer, a court considers:

> [i] the time, place and occasion for the act; [ii] the history of the relationship between employer and employee as spelled out in actual practice; [iii] whether the act is one commonly done by such an employee; [iv] the extent [to which the act] depart[s] from normal methods of performance; and [v] whether the specific act was one that the employer could reasonably have anticipated.

*Fountain*, 838 F.3d at 138 (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979)).

---

[3] Though the Complaint does not make clear where the second conversation with 60 Minutes or the conversations with the author occurred, both parties proceed under the assumption that New York law applies, so the Court will assume its applicability for purposes of resolving the Motion. *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies." (citing *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 n.1 (11th Cir. 1983))).

"Under New York law, the mere fact that an employee is alleged to have engaged in an intentional tort does not compel the conclusion that the employee was acting outside of the scope of employment." *Griebsch v. Weaver*, No. 7:05-cv-958, 2005 WL 2260374, *3 (N.D.N.Y. Sept. 16, 2005) (citing *Sims v. Bergamo*, 3 N.Y.2d 531, 534-35 (1957)) (other citation omitted*); see also Brancato v. Dee and Dee Purchasing*, 296 A.D.2d 518, 519 (2d Dep't 2003). "[A]n employee's tortious acts fall within the scope of his employment if 'done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.'" *United States v. Tomscha*, 150 F. App'x 18, 19 (2d Cir. 2005) (quoting *Riviello*, 47 N.Y.2d at 302).

Here, the Court finds that Plaintiffs have not carried their burden of showing that Labbat was acting outside the scope of his employment at the time he made the alleged defamatory statements. *Mullane v. Moreno*, No. 21-13468, 2025 WL 1386666, at *1 (11th Cir. May 14, 2025) ("[T]he burden of proving that an employee acted outside the scope of employment is on the plaintiff."). The Sixth Circuit has provided a helpful elucidation of the requirements of this employment analysis. The first question is whether, pursuant to 28 U.S.C. § 2671, the individual was, at the relevant time, (1) an "officer[] or employee[] of any federal agency" or (2) a "person[] acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." *Laible v. Lanter*, 91 F.4th 438, 445 (6th Cir. 2024). The latter formulation is often referred to as the "official capacity clause." *See Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022). Satisfying either formulation meets the statutory definition of an "employee" for purposes of a Westfall Act certification. *Id*. It is only after answering in the affirmative that an individual was an "employee" pursuant to one of these formulations that one turns to the second part of the analysis—"whether [the individual] was acting within the scope of his federal employment at the time of the incident." *Id*.

The Court begins with the first question based on the relevant factual background. The Government represents—and Plaintiffs do not dispute—that Labbat's first conversation with 60 Minutes occurred on September 13, 2023, which was during Labbat's employment. ECF No. [24] ¶ 3. The second conversation occurred the day after Labbat's retirement but was coordinated by DHS. *Id.* As to Labbat's conversations with Campbell, although they occurred between November 2023 and February 2024, they were initially authorized in August 2023 by DHS and were coordinated through DHS' Director for Office of Public Affairs/Television and Motion Pictures, even after Mr. Labbat's retirement. *Id.* ¶ 4. Moreover, all content discussed with Campbell was approved by DHS prior to publication. *Id.* Indeed, the United States provides evidence of its approval and active coordination of these conversations, which occurred during Labbat's employment. *See* ECF No. [19-2] and [19-3].

The Supreme Court has provided one indication of how the official capacity clause is meant to function.

> In *Logue v. United States*, the parents of a federal prisoner who hanged himself while in a county jail brought suit against the United States pursuant to the FTCA for the wrongful death of their son. 412 U.S. 521, 522, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The plaintiffs argued that under the federal employee clause, the county jail was a federal agency, and under the official capacity clause, the jail employees were "acting on behalf" of the Federal Bureau of Prisons. *Id.* at 526, 93 S.Ct. 2215. The Court established that the critical factor in differentiating between federal employees and contractors "is the authority of the principal to control the detailed physical performance of the contractor." *Id.* at 527–28, 93 S.Ct. 2215. In other words, where the federal government exercises that level of control over an individual, the definition of federal employee is met. *See id*.

*Laible*, 91 F.4th at 443. Ultimately, the Supreme Court determined that the phrase "acting on behalf of" appeared "to cover special situations such as the 'dollar-a-year' man who is in direct service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement." *Logue*, 412 U.S. at

530–31; *see also Talignani*, 26 F.4th at 386 (explaining that the official capacity clause was meant to extend immunity to volunteers, special law enforcement, confidential informants, and any other scenarios in which the individual was not a federal employee, nor federal contractor, but still acted on behalf of the federal government in an official capacity). The Supreme Court reinforced this "control" or "supervision" test in *United States v. Orleans*, 425 U.S. 807 (1976), and the Eleventh Circuit has adopted it. *See Patterson & Wilder Const. Co. v. United States*, 226 F.3d 1269, 1274 (11th Cir. 2000) ("As this definition makes clear, even private individuals who are not on the Government's payroll may be considered employees for purposes of establishing the Government's liability under the statute.").

Under this control test, Labbat had the requisite arrangement with the United States to be considered a federal employee for purposes of the official capacity clause. The meetings were—at a minimum—arranged, scheduled, and coordinated by DHS. They occurred at DHS's behest and pursuant to DHS's permission. DHS had "control over the rules governing the" interactions. *Laible*, 91 F.4th at 445. DHS did not give Labbat a broadly defined task of speaking to media while leaving to his discretion how the task was accomplished. *Patterson*, 226 F.3d at 1274. It "decided, and instructed [Labbat] on, virtually every important aspect of" the media interactions. *Id.* at 1275. In short, Labbat clearly acted on behalf of a federal agency. *Id*.

Thus, the Court turns to the next question—insofar as Labbat was functionally still a Government employee at the time of the alleged defamatory statements, whether he was acting within the scope of his employment. That question is controlled by New York law.

11

As a general matter, New York law holds that actions taken after one's departure from employment cannot be considered within the scope of employment.[4] As no New York court has addressed the factual scenario presented here,  the Court undertakes the scope of employment analysis prescribed by New York law, assessing (1) whether the employer is, or could be, exercising some control, directly or indirectly, over the employees activities, and (2) whether the employee is doing something in furtherance of the duties he owes to the employer. *Fountain*, 838 F.3d at 135 (quoting *Hamm*, 483 F.3d at 138).

As to the first question, the answer seems to be a clear affirmative. DHS arranged and coordinated the meetings at issue, exercising continuous control over Labbat's activities; they occurred only because of DHS' willing participation and cooperation. As to the second question, the Court considers the following:

> [i] the time, place and occasion for the act; [ii] the history of the relationship between employer and employee as spelled out in actual practice; [iii] whether the act is one commonly done by such an employee; [iv] the extent [to which the act]

---

[4] *See, e.g., Greene v. Trs. of Columbia Univ.*, 234 F. Supp. 2d 368, 382 (S.D.N.Y. 2002) ("Threats occurring after Williams's termination are clearly outside the scope of employment and thus do not implicate Columbia."); *Meehan v. Cnty. of Suffolk*, 144 A.D.3d 640, 641–42, 40 N.Y.S.3d 494, 496 (2016) ("[T]he fact that some of the duties Roslyn performed as an independent contractor were identical to those she had previously performed as the County defendants' employee prior to her retirement from their employ in March 2009, did not convert the relationship between the County defendants and Roslyn into one of employer-employee." (citations omitted)); *Coleman & Co. Secs., Inc. v. Giaquinto Family Trust*, 236 F. Supp.2d 288, 303 (S.D.N.Y. 2002) (under New York *respondeat superior* law, employee's "departure bars any claim of vicarious liability or negligent supervision beyond" his termination date); *Schlesinger v. Pitney Bowes, Inc.*, 722 N.Y.S. 2d 343, 345 (2001) (*respondeat superior* claim failed because "at the time [employee] left the allegedly threatening voice-mail message he had already been terminated"); *D'Amico v. Christie*, 71 N.Y. 2d 76, 88–89 (1987) (*respondeat superior* claim "at the minimum . . . requires an existing relationship"); *Olson v. B&S Caring Assocs., Inc.*, 271 A.D. 2d 588, 588–89 (2d Dept. 2000) ("The Supreme Court properly determined that the defendants were not liable under the doctrine of *respondeat superior* for [the] murder, as the employer-employee relationship had ended by the time of the murder."); *Koran I. v. New York City Bd. of Educ.*, 256 A.D. 2d 189, 191 (1st Dept. 1998) ("*Respondeat superior* cannot exist without a present employer-employee relationship."); *Loucks v. Cmty. Home Care Servs.*, 209 A.D. 2d 484, 484-85 (2d Dept. 1994) (Inasmuch as "[employer] fired [employee] one week prior to the alleged assault," it "may not be held vicariously liable under the doctrine of *respondeat superior* for the assault committed by its former employee.").

depart[s] from normal methods of performance; and [v] whether the specific act was one that the employer could reasonably have anticipated.

*Fountain*, 838 F.3d at 138 (quoting *Riviello*, 47 N.Y.2d at 303). As to the first factor, the meetings took place in close proximity to Labbat's formal employment, at places and on occasions fixed by the United States. As to the second factor, the conversations and statements at issue arose in the context of the federal investigation to which Labbat was assigned. Indeed, the first set of statements to 60 Minutes were made during a DHS-coordinated event which 60 Minutes was authorized to attend and film, and the conversations with the author were coordinated and approved by DHS. ECF No. [19-1]. In effect, each of these interactions were actions that DHS contemplated Labbat taking. As to the third and fourth factors, there is no indication in the record of whether speaking to the press in general is a common task for current or former special agents or whether Labbat's discussions with 60 Minutes and Campbell diverged from normal performance of such a task. As to the final factor, New York law holds that "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment." *Riviello*, 47 N.Y.2d at 304 (1979). Here, Labbat speaking with 60 Minutes and Campbell was "generally foreseeable" to DHS; indeed, DHS *did* foresee these conversations and, in fact, facilitated them. Labbat's specific comments regarding the investigation—even allegedly untruthful comments— were also generally foreseeable, as Labbat was entering into these conversations for purposes of discussing the investigation.[5]

---

[5] Plaintiffs' argument that Labbat's actions were not within the scope of his duties because speaking to the press is not listed as a duty of Homeland Security Investigations agents is unavailing. ECF No. [17] at 9–10. New York law does not limit the scope of employment to expressly assigned tasks. It also covers "reasonably expected" acts or acts that are a "natural incident" of the employment, with a broader emphasis on "general foreseeability." *Riviello*, 47 N.Y.2d at 303. Labbat's conversations were both foreseeable and expected.

Similarly, Plaintiffs' argument that Labbat could not have been acting on behalf of DHS when his statements contradicted DHS' stated position fails. ECF No. [17] at 10–11. The relevant question is not

The Court is not firmly convinced that Labbat "in fact" engaged in conduct beyond the scope of his employment. *Osborn*, 549 U.S. at 231. Indeed, all the evidence available to the Court indicates that Labbat, though nominally retired, was functioning in an official capacity DHS at the time he made the alleged defamatory statements and made those comments within the scope of his official capacity. The Court is not alone in finding that one who is no longer technically employed can still be serving within their official capacity. In the Eastern District of Louisiana, for example, one judge indicated that post-employment conduct fell within the scope of former employment for Westfall Act certification purposes where the individual's actions were part of one larger tortious "transaction." *West v. Rieth*, 152 F. Supp. 3d 538, 548 (E.D. La. 2015). Another Eastern District of Louisiana case later reiterated this point, finding that post-employment conduct that served the employer's interest could be deemed within the scope of employment. *Cooper v. United States*, No. CV 16-15414, 2017 WL 699835, at *5 (E.D. La. Feb. 22, 2017). Thus, the Court finds that Labbat was an employee acting within the scope of his employment for purposes of assessing the Government's Motion to Dismiss.

## B. Jurisdiction

The United States raises arguments in support of dismissal for lack of jurisdiction premised on Labbat's status as a Government employee. Specifically, the United States argues that, upon

---

whether DHS controlled Labbat's comments down to the exact words but whether DHS had the "authority" to "control the detailed physical performance of" actor. *Logue*, 412 U.S. at 527–28. Here, DHS had such authority, dictating the circumstances of Labbat's interactions with 60 Minutes and Campbell and approving all conduct prior to publication.

Finally, Plaintiffs' argument that Labbat was motivated by personal gain is unconvincing. ECF No. [17] at 12–13. New York law excludes an action from the scope of employment where the action was taken based on "wholly personal motives," *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251, 765 N.E.2d 844 (2002), and was "unrelated to the furtherance of the [agency's] business." *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933, 715 N.E.2d 95 (1999). The Court does not see such wholly personal motives manifested here where DHS clearly desired that these interactions should occur, going so far as to coordinate and facilitate them. That clearly indicates action taken in furtherance of the agency's business.

removal, the federal court adopts the jurisdictional limits of the state court that initially heard the case. ECF No. [6] at 3 (citations omitted). As a result, if the state court lacked jurisdiction, so too does the federal court upon removal. *Id*. Here, the state court lacked subject matter jurisdiction over an FTCA claim brought against a federal employee, as federal courts have exclusive jurisdiction over FTCA claims, so this Court lacks jurisdiction as well. *Id*.

Plaintiffs do not respond specifically to this argument, but instead argue that Labbat was not a Government employee and, as a result, the jurisdictional bars cited by the United States do not apply. ECF No. [17] at 20–23.

The FTCA provides the exclusive remedy for torts committed by federal agencies or federal employees. *United States v. Smith*, 499 U.S. 160, 173 (1991). As a result, a tort claim brought against a federal employee necessarily proceeds under the FTCA. *Id*. Pursuant to 28 U.S.C. § 1346(b)(1), federal courts have exclusive jurisdiction over civil actions against the United States for money damages, including FTCA claims. Any claim under the FTCA must originally be filed in federal court.

The Supreme Court has instructed that the "jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction." *Lambert Run Coal Co. v. Baltimore & Ohio R.R. Co.*, 258 U.S. 377, 382 (1922). Under the doctrine of derivative jurisdiction, "[i]f the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." *Id*. "Because, as noted, federal courts have *exclusive* jurisdiction over FTCA claims—and since the Plaintiff brought this FTCA claim in *state court*—the state court in which the Plaintiff filed her case lacked jurisdiction to hear it."[6]

---

[6] As recently as 2021, the Eleventh Circuit has reiterated the applicability of this doctrine to cases removed, as here, pursuant to 28 U.S.C. § 1442. *Reynolds v. Behrman Cap. IV L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021).

*Barrett v. U.S. Postal Serv.*, No. 20-60156-CV, 2020 WL 2764265, at \*2 (S. D. Fla. Feb. 10, 2020).

As a result, the Court lacks subject matter jurisdiction, and the case must be dismissed without prejudice.[7]

### IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   Defendant's Motion to Dismiss, **ECF No. [6]**, is **GRANTED.**

2.   The case is **DISMISSED WITHOUT PREJUDICE**.

3.   The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 24, 2026.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

---

[7] If Plaintiffs choose to refile their case in federal court, they should bear in mind that 28 U.S.C. § 2680(h) provides a statutory exemption from the FTCA for claims arising out of libel and slander.